# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**MARK ENSLEY, et al.,**

     **Plaintiff(s),**   **CASE NUMBER: 06-12845**
               **HONORABLE VICTORIA A. ROBERTS**

**v.**

**FORD MOTOR COMPANY,**
**et al.,**

     **Defendant(s).**
_____/

## ORDER

### I. INTRODUCTION

This matter is before the Court on Defendant Ford Motor Company's Motion to Dismiss and Defendant Visteon Corporation's Motion to Dismiss. The matter has been fully briefed. Oral argument was heard on January 10, 2007. For the reasons stated below, Defendants' motions are **GRANTED IN PART** and **DENIED IN PART**.

### II. BACKGROUND

Plaintiffs are salaried employees of Defendant Ford Motor Company ("Ford").[1] They filed this class action on behalf of themselves and similarly situated employees. They allege that Ford and one of its former subsidiaries, Defendant Visteon Corporation ("Visteon"), engaged in multiple violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1101, *et seq*, which resulted in a loss of certain

_____

[1]Mark Ensley, James Barth, Donald Blum, Gary Chinigo, Robert Matsui, Gregory Nycholas and Joseph Pieprzak.

1

retirement benefits.

Ford is an automotive manufacturer. Visteon manufactures automotive parts and, prior to June 28, 2000, was a wholly-owned subsidiary of Ford. On June 28, 2000, Ford distributed its entire interest in Visteon to Ford shareholders (hereinafter "the spin-off"). Ford did not retain equity in Visteon; Visteon became an independent, publicly traded corporation.

Certain salaried Ford employees, including Plaintiffs, were transferred to Visteon as a result of the spin-off and became Visteon employees. The transfer was involuntary and mandatory. The affected employees' Ford employment was terminated as of the transfer date--June 28, 2000. However, per Plaintiffs, many employees continued to work at the same plants and perform the same jobs after the spin-off.

Prior to the spin-off, Plaintiffs participated in Ford's Group Retirement Plan ("GRP"). The GRP is a defined benefit pension plan that pays fixed monthly or lump sum retirement pension amounts to eligible Ford employees. The GRP provides a variety of pension benefits, including regular and early retirement pensions and certain supplemental pension allowances. During oral argument, counsel for Plaintiffs clarified that their Complaint only pertains to the "30 and Out" pension supplement. Under the "30 and Out" provision, employees with at least 30 years of credited service who take early retirement are eligible for an additional monthly pension payment until the age of 62.

Two months prior to the spin-off, in April 2000, Ford and Visteon executed an Employee Transition Agreement ("ETA"), which governed the transfer of Ford salaried employees to Visteon. One stated purpose of the ETA was to facilitate the "orderly

transition of benefit plans." ETA attached to Complaint as Exh. 1 at ¶5.

The ETA categorized Ford salaried employees into three groups--Groups I, II and III. Plaintiffs fell into Group II, which included employees whose combined age and years of continuous Ford service equaled 60 or more as of June 1, 2000, and who would be eligible for normal or early retirement within a certain time after the spin-off. Under the ETA, Ford retained liability for pension benefits which accrued for Group II employees prior to the transfer, but Visteon was required to establish a "substantially comparable" retirement plan--the Visteon Mirror Group Retirement Plan ("VMGRP")--for employee service after the date of the transfer. And, Ford agreed to amend the GRP so that the transferred employees' combined years of service with Ford and Visteon would be used to determine the transferred employees' eligibility for retirement benefits under the GRP; years of service were not to be combined to determine benefit amount. ETA at ¶3.01(c)(ii). The benefit amount would be based, in part, on the salary earned at Visteon. *Id.* Ford and Visteon also agreed to pay a pro-rata share of any early retirement supplement (under the "30 and Out" provision), based on the employee's respective years of service. ETA at ¶3.01(d)(i). Ford amended the GRP in accordance with the terms of the ETA in August 2000.

Over three years after the spin-off, in November 2003, Ford says that it amended the GRP again. However, Plaintiffs argue that the amendment was only proposed and never adopted. This amendment provided that any employee hired or re-hired by Ford after January 1, 2004 would be excluded from participating in the GRP. New hires or re-hires would instead participate in a defined contribution pension plan called the Ford Retirement Plan ("FRP").

Two years later in late 2005, Ford agreed to re-acquire 24 of Visteon's North American plants, including the Sterling Heights and Rawsonville plants where Plaintiffs worked. Salaried employees at the affected Visteon plants were forced to accept the transfer of employment; they were terminated by Visteon and hired (or, in the case of Plaintiffs, re-hired) by Ford. Nevertheless, Plaintiffs say that many of the transferees continued to work under the same conditions as before the transfer.

Ford and Visteon entered into another agreement to facilitate the transfer of employees to Ford after the re-acquisition--the Visteon Salaried Employee Transition Agreement ("VSETA"). The VSETA provides that pension benefits which accrue after the employees' transfer to Ford will be provided under the FRP, rather than the GRP. *See* VSETA attached to Complaint as Exh. 2 at ¶3.01(a). Pursuant to the 2003 GRP amendment, the Visteon transferees were effectively treated as new hires or re-hires with regard to the pension plan that would apply to calculate their post-Visteon benefits. Also, like the ETA, the VSETA provides that Group II employees' combined years of service with Ford and Visteon will be used to determine their eligibility for retirement benefits under the FRP and GRP, but not the benefit amount. *Id* at 3.01(a)-(b).

In January 2006, Visteon announced that it would no longer pay an early retirement supplement after June 30, 2006. Per Plaintiffs, Visteon's share of the "30 and Out" supplemental pension is not available to salaried employees who retire after July 21, 2006 (although Ford will continue to pay its pro-rata share and will count Visteon service to determine eligibility).

Plaintiffs assert that the spin-off and amendments to the GRP were merely a corporate scheme by Ford and Visteon to allow Ford to avoid paying full retirement

benefits to salaried workers.  Plaintiffs assert that Visteon was never really independent of Ford; they contend the spin-off was a sham to facilitate Defendants' scheme.

At the time of the 2000 spin-off, Plaintiffs had between 23 and 32 years of service with Ford.  The specific benefits Plaintiffs complain were lost because of the spin-off, re-acquisition and 2003 GRP amendment include: 1) their ability to accrue pension benefits under the GRP and VMGRP; 2) Visteon's share of the "30 and Out" supplement, which has an estimated value of over $100,000 for some employees; and 3) their ability to combine Ford and Visteon years of service to calculate the benefit amount.[2]  Plaintiffs assert they will not receive the same or comparable benefits as similarly situated Ford employees who never transferred to Visteon or who were allowed to retire from Visteon.

Prior to the 2000 spin-off, Plaintiffs claim that Ford made multiple written promises that they would receive the same level of retirement benefits if Visteon became an independent company.  However, Plaintiffs do not indicate exactly when the promises were made or by whom.

---

[2]Plaintiffs also assert in their brief that they are prevented from adding both periods of employment at Ford and their service at Visteon to calculate their *entitlement* to the "30 and Out" retirement supplement.  Pl. br. at p. 6.  In fact, however, the VSETA states that all years of service with Ford and Visteon will be combined to determine eligibility for normal and early retirement benefits:

> The sum of the years of credited service under the GRP prior to July 1, 2000, plus years of service at Visteon . . ., plus years of service under the FRP after the Transition Date, shall be used solely for the purpose of fulfilling the minimum years of credited service required as a condition of eligibility for GRP benefits, but not for the purposes of calculating the benefit amount.

VSETA at ¶3.01(b)(ii).

Plaintiffs also contend that Ford and Visteon concealed the ETA from them (a claim Ford denies) and that they misrepresented the status of Plaintiffs' future retirement benefits. Plaintiffs say that concealment of the ETA shows that Ford and Visteon knew that the promises they made might not be true.

In their Complaint, Plaintiffs request a declaratory judgment and assert multiple claims under ERISA: 1) Count I--declaratory judgment establishing Visteon as a business unit (*i.e.,* alter ego) of Ford; 2) Count II--breach of duty to provide notice; 3) Count III--breach of fiduciary duty to avoid conflicts of interest; 4) Count IV--breach of fiduciary duty not to provide misleading information regarding ERISA rights and benefits; 5) Count V--breach of fiduciary duty to refrain from concealing material information; and 6) Count VI--interference with ERISA rights.

Defendants contend each Count must be dismissed for failure to state a claim. Plaintiffs concede they failed to state claims in Counts IV and V, but oppose dismissal of the other claims.

## III.   STANDARD OF REVIEW

When reviewing a Rule 12(b)(6) Motion, the trial court "must construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein." *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994); *see also Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995). Because a Rule 12(b)(6) motion rests upon the pleadings rather than the evidence, "[i]t is not the function of the court [in ruling on such a motion] to weigh evidence or evaluate the credibility of the witnesses." *Miller*, 50 F.3d at 377. The court should deny a Rule 12(b)(6) motion "unless it appears beyond doubt that the plaintiff can prove no set of

6

facts in support of his claim which would entitle him to relief." *Conley v Gibson,* 355 U.S. 41, 45-46 (1957). *See also Gazette*, 41 F.3d at 1064; *Miller*, 50 F.3d at 377. "While this standard is decidedly liberal, it requires more than the bare assertion of legal conclusions." *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993). Rather, the complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *DeLorean*, 991 F.2d at 1240 (citations omitted).

## IV.     APPLICABLE LAW AND ANALYSIS

### A.     Count I--Declaratory Judgment

Count I is brought under 29 U.S.C. §1132(a)(1)(B), which authorizes a participant or beneficiary of an employment benefit plan to bring a civil action "to clarify his rights to future benefits under the terms of the plan." Plaintiffs ask that the Court declare: 1) Visteon to be a business unit and "participating subsidiary" of Ford from its inception to the present, and 2) that Plaintiffs have continuous service credits under the GRP from June 28, 2000 to the present. Complaint at ¶23. Plaintiffs assert that the requested declarations are warranted despite the 2000 spin-off because, "Visteon, at all relevant times, was an instrumentality of [Ford] and was operated as its alter-ego and a business unit of [Ford] even after its alleged 'independence'." *Id* at ¶21. Plaintiffs allege that Ford continued to exercise dominion and control over Visteon after the spin-off in order to interfere with their ERISA rights. *Id* at ¶22.

Ford and Visteon argue that the alter ego doctrine does not apply to determine

whether they are a single company.[3]  And, even assuming that the alter ego doctrine applies, Ford asserts that Plaintiffs have not alleged that the pension benefit plan amendments at issue violated any provision of ERISA.  In fact, Ford contends that ERISA does not prohibit it from modifying non-vested future benefit plans such as the ones at issue.  Therefore, Ford asserts that the Court does not have the authority to re-write the terms of its GRP amendments or contracts with Visteon to grant the relief requested by Plaintiffs.

Absent a finding that Ford and Visteon are alter egos, Visteon further argues that it is not proper to direct the claims in Count I against it, because the claims are based on amendments to the GRP, rather than the VMGRP.  Visteon asserts that it did not control administration of the GRP.

### i.    Plaintiffs May Proceed Under the Alter Ego Doctrine

Although the matter has not been addressed by the Sixth Circuit or other jurisdictions in the context presented, it appears that Plaintiffs may proceed under the alter ego doctrine to establish liability in this case.  As Plaintiff points out, courts in the Sixth Circuit and other jurisdictions allow plaintiffs to proceed under the alter ego theory in myriad other contexts under ERISA, including:  to determine liability for vested health benefits,[4] to determine liability for vested/accrued benefit or pension fund contributions,[5]

_____

[3]Visteon actually incorporates Ford's argument on this issue by reference.

[4]*Yolton v El Paso Tennessee Pipeline Co.,* 435 F.3d 571 (6th Cir. 2006), *cert. den.,* 126 S.Ct. 555 (2006).

[5]*Laborers' Pension Trust Fund v Sidney Weinberger Homes, Inc.,* 872 F.2d 702 (6th Cir. 1988); *Central States, Southeast and Southwest Areas Pension Fund v Sloan*, 902 F.2d 593 (7th Cir. 1990); *Chicago District Council of Carpenters Pension Fund v*

and to assess liability against non-fiduciaries who assisted in a breach of fiduciary duty.[6]

There is no support for Defendants' assertion that the "common control" test should apply instead. The common control test is used to determine whether multiple companies should be deemed a single employer for purposes of assessing which of multiple employers are liable under the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. §1381, *et seq.,* when employers withdraw from a pension plan that is not sufficiently funded to cover accrued benefits (also known as "withdrawal liability").[7] *See Pension Benefit Guaranty Corp. v East Dayton Tool and Die Co.,* 14 F.3d 1122 (6th Cir. 1994); *Pension Benefit Guaranty Corp. v J.D. Industries, Inc.,* 887 F.Supp. 151 (W.D. Mich. 1994); *CMSH Co., Inc. v Carpenters Trust Fund for Northern California,* 963 F.2d 238 (9th Cir. 1992).

Although withdrawal liability is not at issue, Defendants contend that one can infer that Congress prefers the common control test over alter ego principles whenever it is necessary to determine whether multiple employers are to be deemed equally liable under ERISA. At least one district court explicitly rejected Defendants' argument. In

---

*PMQT, Inc.,* 169 F.R.D. 336 (N.D. Ill. 1996); *Massachusetts Carpenters Central Collection Agency v Belmont Concrete Corp.,* 139 F.3d 304 (1st Cir. 1998).

[6]*Lowen v Tower Asset Management, Inc.,* 829 F.2d 1209 (2nd Cir. 1987).

[7]For purposes of assessing the withdrawal liability of multiple companies, "all . . . trades or businesses (whether or not incorporated) which are under common control shall be treated as . . . a single employer." 29 U.S.C. §1301(b)(1). "Common control" is "one or more chains of organizations conducting trades or businesses connected through ownership of a controlling interest. . . ." 26 C.F.R. §11.414(c)-2(b)(1). A corporate controlling interest is: "ownership of stock possessing at least 80 percent of the total combined voting of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation." 26 C.F.R. §11.414(c)-2(b)(2)(a).

*Brown v Astro Holdings, Inc.,* 385 F.Supp.2d 519, 532 (E.D. Pa. 2005), the court found

that the alter ego doctrine is a permissible theory of liability against multiple companies

unless Congress explicitly designated another analysis:

> [T]he Court believes, under the analysis set out in [*Reich v Compton,*
> 57 F.3d 270 (3rd Cir. 1995)], that the MPPAA permits a plaintiff to
> bring a claim for alter ego liability alleging that a defendant is the
> alter ego of the statutory employer. This same analysis, however,
> dictates that the MPPAA will not permit a plaintiff to bring a claim for
> alter ego liability alleging that a defendant is the alter ego of a trade
> or business "under common control" with a statutory employer.
> Unlike the term "employer," entities under "common control" are
> defined in the statute, in a "seemingly comprehensive" list set out in
> authorized regulations of the Internal Revenue Service. As in
> *Compton*, allowing liability to be imposed on an alter ego of an entity
> "under common control" would effectively add another, overlapping
> category to the existing list. With respect to entities under common
> control, the MPPAA does set out a "carefully crafted and detailed
> legislative scheme" whose balance of competing interests courts
> "should not attempt to adjust." *Compton,* 57 F.3d at 277 (citation and
> internal quotation omitted).

Defendants have not identified a statute or other authority which requires the

Court to employ the common control test (or another particular test) to determine

whether they should be regarded as a single employer under ERISA. Moreover, the

fact that the alter ego doctrine has been applied to other types of ERISA claims

undercuts Defendants' assertion that the common control test is the preferred or

exclusive means to determine the relationship between two companies for all ERISA

claims.

The Court finds that Plaintiffs are not precluded from asserting their claims under

the alter ego doctrine.

### ii.    Plaintiffs Failed to State a Claim for Declaratory Judgment

Nevertheless, Plaintiffs' claim in Count I fails as a matter of law. Plaintiffs

essentially ask the Court to declare that the 2000 spin-off and the 2003 amendments to the GRP are null and void. That is, Plaintiffs ask the Court to declare that they were always Ford employees and, therefore, they are entitled to continue accruing benefits under the GRP (and presumably that Ford is liable for their entire early retirement supplement rather than a *pro rata* share). Inherent in Plaintiffs' request is the presumption that Defendants were not entitled to modify their future pension benefits. But, Plaintiffs' do not cite any authority to support this presumption. In fact, ERISA does not prohibit an employer from amending or eliminating pension benefits which have not vested or accrued.

In *Adams v Avondale Industries, Inc.,* 905 F.2d 943 (6th Cir. 1990), employees brought an ERISA action against their employer for severance benefits. Defendant Avondale Industries, Inc. had an unwritten policy of providing severance benefits to salaried employees who were involuntarily terminated. But, when Avondale decided to sell all of the assets of its Ortner division to an unrelated entity, it executed a written severance plan which effectively amended the unwritten policy to deny severance pay to any Ortner division salaried employee who accepted a position with the acquiring company. Severance benefits were only paid to employees who refused or were not offered a job with the new company. Employees who were denied severance benefits subsequently filed suit arguing that the amended severance plan was ineffective because it was promulgated in a bad-faith attempt to avoid paying promised benefits.

The district court granted defendant's motion for summary judgment on the ground that defendant's interpretation of the amended severance plan was valid. The court declined to address whether the amendment itself was valid. Plaintiffs appealed.

On appeal, they argued that ERISA's requirement that plan administrators exercise fiduciary duties of care and loyalty when administering a benefits plan was intended to foreclose amendment or termination of benefit plans except when doing so is in the interest of the plan participants.

The Sixth Circuit rejected this argument. It noted that there is a distinction between vested pension benefit plans and non-vested welfare benefit plans, such as the severance benefit plan at issue. The Court pointed out that Congress deliberately exempted welfare benefit plans from the vesting and participation obligations of ERISA, *see* 29 U.S.C. §§1051, 1081, so as not to financially overburden employers. And, the Court held that imposing the limitations plaintiffs proposed on defendant's ability to amend or terminate a welfare benefit plan would effectively give employees vested rights to welfare benefit plans, contrary to Congress' express intentions. Therefore, the Court held that "a company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan." The Court also noted that the Fourth, Seventh and Eleventh Circuits, likewise, hold that an employer does not violate ERISA when it amends or terminates a non-vested welfare benefit plan.

In *Sutton v Weirton Steel Division of National Steel Corporation,* 724 F.2d 406 (4th Cir. 1983), the Court rejected plaintiffs' assertion that defendant was not entitled to unilaterally eliminate its obligation to pay early retirement and severance benefits to nonunion employees. Plaintiffs opposed a proposed sales agreement drafted by Defendant in preparation for the sale of a division of Defendant's company. The proposed agreement included a stipulation that the sale would not trigger payment of early retirement and severance benefits previously provided to qualifying employees

during a shutdown or layoff.

Plaintiffs filed suit and argued that, even if they were hired by the new company, their employment with defendant was terminated and, therefore, they were entitled to the promised early retirement and severance benefits. Plaintiffs asserted that defendant's sole motivation for the proposed amendment was to avoid the estimated $300 million cost to provide early retirement and severance pay upon sale of the division. The district court granted summary judgment in favor of defendant.

The Fourth Circuit affirmed. The *Sutton* Court held that ERISA's vesting rules only prohibit forfeiture of accrued benefits, which does not include non-vested, contingent early retirement and severance benefits:

> The accrued benefits secured by ERISA do not encompass unfunded, contingent early retirement benefits or severance payments. The Act was not designed to prohibit modification of these ancillary benefits.

724 F.2d at 410. Therefore, "[a]n employer may change such benefits without violating ERISA." *Id.* Rather, an employee would only have a viable claim to protest a unilateral amendment or termination of non-vested welfare benefits if his employment contract required the employer to provide such benefits:

> Any right to payment of benefits before normal retirement age must be found in pertinent employment agreements.

*Id.*

The Seventh Circuit in *Young v Standard Oil (Indiana),* 849 F.2d 1039, 1045 (7th Cir. 1988), made a similar finding with regard to a non-vested severance plan which defendant amended prior to sale of a division of the company in order to avoid paying $6.2 million in severance benefits:

13

Although ERISA imposes stringent accrual, vesting, and funding requirements on retirement benefit plans, such requirements are not imposed on welfare benefit plans. Severance benefit plans are welfare benefit plans. As such, severance benefits are unaccrued, unvested benefits. Moreover, severance benefit plans, though subject to certain disclosure (29 U.S.C. §§1021-1031) and fiduciary (29 U.S.C. §§1101-1114) requirements, are exempt from the more stringent ERISA requirements. 29 U.S.C. §§1051, 1081. **An employer may therefore, unilaterally amend or eliminate a severance plan without violating ERISA.** This is so because an employer is permitted to act in a dual capacity as both the manager of its business and a fiduciary with respect to unaccrued benefits. **An employer is therefore, free to alter or eliminate severance benefits (which are usually solely funded by the employer) without consideration of the employees' interests.** In short, an employer does not owe its employees a fiduciary duty when it amends or abolishes a severance benefit plan.

(internal citations omitted and emphasis added).

And, the Eleventh Circuit in *Phillips v Amoco Oil Co.,* 799 F.2d 1464, 1471 (11th Cir. 1986), affirmed the district court's finding that defendants did not breach their fiduciary duties when they included provisions in a sales contract which terminated certain contingent, non-vested retirement benefits. Defendant Amoco sold a division of its company to Defendant Norgas. The sales contract provided that Norgas would offer employment to certain Amoco employees, but that those employees' retirement benefits would be based solely on their years of service with Norgas. The years of service with Amoco would not be credited for the purpose of calculating benefits or determining eligibility for early retirement.

Plaintiffs filed suit alleging, *inter alia*, an ERISA claim of breach of fiduciary duty. Plaintiffs argued that Amoco breached its fiduciary duty by negotiating a higher price by bargaining away their years of service with Amoco. The district court held that "the

fiduciary provisions of ERISA are not implicated in the sale of a business merely because the terms of the sale will affect contingent and non-vested future retirement benefits." 799 F.2d at 1471. On appeal, the *Phillips* Court concurred and held that "ERISA simply does not prohibit a company from eliminating previously offered benefits that are neither vested nor accrued." *Id.*

*Adams, Sutton, Young* and *Phillips* are analogous. Plaintiffs allege that the spin-off, re-acquisition and 2003 GRP amendment will deprive them of: 1) their ability to accrue pension benefits under the GRP and VMGRP; 2) Visteon's share of the "30 and Out" supplement; and 3) their ability to combine Ford and Visteon service to calculate the amount of pension benefits. However, as in *Adams, Sutton, Young* and *Phillips*, none of these benefits was vested or accrued at the time of the spin-off, re-acquisition or 2003 GRP amendment. Therefore, Defendants' modification or elimination of Plaintiff's future early retirement benefits and the manner in which future pension benefits will accrue are not actionable under ERISA. And, Plaintiffs do not identify any contractual provision upon which they can base a state law claim.

There is no basis for the Court to grant Plaintiffs the relief they request. Defendants' motions to dismiss Count I is granted.

### B. Count II--Breach of Duty to Provide Notice

Prior to its amendment in June 7, 2001, ERISA Section 204(h)(1)(A), 29 U.S.C. §1054(h)(1)(A), provided that an employer must give participants in a pension plan advance notice of amendments to the plan which will result in "a significant reduction in

the rate of future benefit accrual:"[8]

> A [pension] plan . . . may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date[.]

Plaintiffs allege in Count II that Defendants violated this provision when they failed to provide Plaintiffs with the required notice that, pursuant to the ETA, the transferred employees' combined years of service with Ford and Visteon would be used to determine the transferred employees' eligibility for retirement benefits under the GRP, but not the amount of benefits owed.

Defendant Ford asserts that dismissal is warranted on two grounds. First, Plaintiffs allege in their Complaint that the notice requirement was triggered by the ETA, rather than the subsequent amendment to the GRP (in August 2000). *See* Complaint at ¶26. However, Ford argues that the plain language of Section 204(h)(1) only imposes upon it a duty to notify participants about the actual adoption of pension amendments, and the amendment at issue was only *proposed* in the ETA. Therefore, Ford asserts that Plaintiffs' claim fails on this basis alone.

Second, presuming that Plaintiffs intended to assert that the August, 2000 amendment to the GRP triggered the Section 204(h)(1) notice provision, Ford argues that Section 204(h)(1) does not apply. After the transfer date, Ford asserts that Plaintiffs were no longer Ford employees and, therefore, pension benefit accrual would have ceased entirely but for the 2000 GRP amendment. Thus, Ford argues that the

---

[8]The parties agree that this former version of Section 204(h)(1) applies.

amendment did not reduce the rate of future pension accruals; rather, it provided future pension benefits that Plaintiffs would not have otherwise been entitled to receive.

In support, Ford cites language from the Internal Revenue Service ("IRS") temporary regulations regarding Section 205(h), which were issued on December 15, 1995 to provide guidance on its requirements.  *See* Def. Exh. F., Temp. Treas. Reg. §1.411(d)-6T, issued at 60 Fed. Reg. 64,320 (1995).   In a section entitled "Explanation of Provisions," the IRS states that a plan administrator is not required to give notice to employees who, prior to the amendment, were not entitled to accrue future benefits under the plan:

> [T]he regulations provide that the plan administrator is not required to provide notice to a participant or alternate payee whose rate of future benefit accrual is reasonably expected not to be reduced by the amendment.  For example, notice need not be provided to participants (such as former employees with a vested benefit under the plan) who, prior to the amendment, were not entitled to accrue future benefits under the plan.

60 Fed. Reg. at 64,321.

Visteon argues that it was not required to provide notice under Section 204(h)(1) because it was not an administrator of the GRP plan.  Section 204(h)(1) expressly provides that it is the duty of the "plan administrator" to provide written notice to participants.  Consequently, Visteon argues that Count II is not properly asserted against it.

Plaintiffs request leave to amend their Complaint to clarify that their assertion that the GRP amendment, rather than Defendants' adoption of the ETA, triggered the notice provisions under Section 204(h)(1).  Further, Plaintiffs argue that Ford was required to give them notice of the GRP amendment in accordance with Section 204(h)(1) because:

1) they were active members of the GRP at the time of the amendment; 2) the amendment caused a reduction in their future supplemental retirement benefits; that is, Ford is now only required to pay a *pro rata* share of "30 and Out" benefits, and Visteon has announced that it will no longer pay an early retirement supplement (including its *pro rata* share of "30 and Out" benefits) to employees retiring after July 21, 2006; and 3) the amendment prohibits Plaintiffs from aggregating their Ford service with Visteon service to calculate the amount of their benefits. Plaintiffs argue that Visteon was obligated to give notice for the same reasons because it was Ford's alter ego.

Neither party cites relevant case law and the Court did not find any cases on point. However, the plain language of the statute suggests, as Ford asserts, that Section 204(h)(1) does not apply.

The statute provides that a plan administrator must give notice when an amendment may result in "a significant reduction in the rate of ***future*** benefit accrual." 29 U.S.C. 1054(h)(1) (emphasis added). The August 2000 amendment was made to conform with the agreements between Ford and Visteon in the ETA. Plaintiffs' assertion that they were entitled to notice of the amendment is premised in part on their contention that they were still accruing retirement benefits under the GRP at the time. In fact, however, the ETA provides that Plaintiffs ceased as Ford employees on the transfer date (June 28, 2000)--just over one month before Ford amended the GRP:

> Unless otherwise agreed, Ford shall transfer the employment of the Active Ford Business Employees to Visteon effective on the Transfer Date and the Active Ford Business Employees shall become Visteon Employees effective on the Transfer Date.

ETA at ¶2.02. And, Ford explicitly limited its liability to retirement benefits accrued prior

18

to the transfer; Visteon agreed to provide retirement benefits from that point forward:

> The Visteon Mirror GRP shall be responsible for providing retirement benefits for Group I and II Employees for service on or after the Benefit Transition Date . . . .

* * *

> The [Ford] GRP shall retain liability for retirement benefits of Group I and Group II employees, but only for service through the Benefit Transition Date.

ETA at ¶¶3.01(b)(i); (c)(ii). Therefore, if the language of the statute is strictly construed, the 2000 GRP amendment did not affect the rate of Plaintiffs' future benefit accrual under the GRP, because Plaintiffs' future benefit accrual under the GRP ceased entirely after June 28, 2000. Consequently, neither Ford nor Visteon (as an alleged alter ego) was obligated to give notice under Section 204(h)(1).

Because there is no ambiguity in the statute, it is not necessary for the Court to rely upon the IRS regulations interpreting Section 204(h)(1) which are cited by Defendant. See *Chevron, USA, INC v Natural Resources Defense Council, Inc,* 467 U.S. 837, 842-843-844 (1984)(A court must consider and give considerable weight to the interpretation of an administrative agency that has been given authority promulgate regulations interpreting a statute, when the statute is silent or ambiguous as to a specific issue, "unless they are arbitrary, capricious, or manifestly contrary to the statute."); *Trafficante v Metropolitan Life Insurance Co,* 409 U.S. 205, 210 (1972)(same). However, it is notable that the IRS regulations are consistent with the plain language of the statute--"notice need not be provided to participants (such as former employees with a vested benefit under the plan) who, prior to the amendment, were not entitled to accrue future benefits under the plan." 60 Fed. Reg. at 64,321.

Defendants' motions to dismiss Count II is granted.

**C.      Count III--Breach of Fiduciary Duty**

Plaintiffs allege in Count III that Ford breached its fiduciary duty to avoid conflicts of interest by "negotiating with itself the creation of the [VMGRP]" and in the negotiation of the ETA.   Complaint at ¶¶33, 34.  Plaintiffs assert that Ford's actions were to their detriment because they limited or eliminated Plaintiffs' rights under the GRP.  Plaintiffs further allege that Ford and Visteon breached their fiduciary duties when they negotiated the VSETA, because Plaintiffs lost "the level of retirement benefits they were promised in 2000."  Complaint at ¶36.

In their Response brief to Visteon's motion, Plaintiffs additionally allege that Visteon is liable for Ford's breaches of duty (presumably, in the creation of the VMGRP and negotiation of the ETA) because it is an alter ego of Ford or, in the alternative, as an aider and abettor.  Plaintiffs acknowledge that their aider and abettor claim is not alleged in its Complaint, but they contend that the facts which are alleged support the theory.  Therefore, they request leave to amend.

Ford and Visteon argue that Plaintiffs' claim fails as a matter of law because they were not acting as fiduciaries when they negotiated and executed the VMGRP, ETA and VSETA.  Ford additionally asserts that Count III is barred by the statute of limitations, and that the claim is superfluous since Plaintiffs request the same relief sought in Count I--an order declaring that they are entitled to have their retirement benefits calculated under the GRP in the same manner they would have been calculated if the spin-off and re-acquisition never occurred.

20

ERISA Section 404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A),[9] provides that:

> (1) [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
>
> > (A) for the exclusive purpose of:
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > >
> > > (ii) defraying reasonable expenses of administering the plan.

ERISA defines a plan "fiduciary" as one who: (i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan. 29 U.S.C. §1002(21)(A).

Under the so-called "settlor doctrine," employers who are also plan sponsors wear two hats--"one as a fiduciary in administering or managing the plan for the benefit of participants and the other as employer in performing settlor functions such as establishing, funding, amending, and terminating the trust." *Hunter v Caliber System, Inc.,* 220 F.3d 702, 718 (6th Cir. 2000). *See also Akers v Palmer,* 71 F.3d 226, 231 (6th Cir. 1995). An employer acting in a dual capacity is only required to comply with its fiduciary obligations when it is acting in a fiduciary capacity. *Sengpiel v B.F. Goodrich*

---

[9]Plaintiffs erroneously cite 29 U.S.C. §1002(a)(1)(B), which does not exist. Complaint at ¶32. Therefore, they request leave to amend to correct the citation to 29 U.S.C. §1104(a)(1)(B). Pl. Visteon Response Br. at n.9. However, in light of Plaintiffs' allegations, it actually seems that Plaintiffs intended to cite 29 U.S.C. §1104(a)(1)(A).

*Co.,* 156 F.3d 660, 665 (6th Cir. 1998); *Hunter,* 220 F.3d at 718. "Accordingly, courts have typically distinguished between employer actions that constitute 'managing' or 'administrating' a plan and those that are said to constitute merely 'business decisions' that have an effect on an ERISA plan; the former are deemed 'fiduciary acts' while the latter are not." *Id.* "'ERISA does not require that day-to-day corporate business transactions, which may have a collateral effect on prospective, contingent employee benefits, be performed solely in the interest of plan participants.'" *Akers,* 71 F.3d at 231 (*quoting Adams v Avondale Industries, Inc.,* 905 F.2d 943, 947 (6th Cir. 1990)).

It is well settled that an employer's modification or termination of a benefit plan is a business decision, rather than a fiduciary act. "When an employer adopts, modifies or terminates a pension plan its actions are analogous to that of settlor of a trust rather than that of trustee or fiduciary." *Coomer v Bethesda Hospital, Inc.*, 370 F.3d 499, 508 (6th Cir. 2004). "In general, an employer's decision to amend a pension plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties which consist of such actions as the administration of the plan's assets." *Hughes Aircraft Co. v Jacobson*, 525 U.S. 432, 444 (1999). "'[B]ecause [the] defined functions [in the definition of fiduciary] do not include plan design, an employer may decide to amend an employee benefit plan without being subject to fiduciary review.'" *Lockheed Corp. v Spink*, 517 U.S. 882, 890-891 (1996)(*quoting Siskind v Sperry Retirement Program, Unisys,* 47 F.3d 498, 505 (1995)).

Likewise, an employer's sale of all or a portion of its business, which negatively impacts a plan participant's future contingent, nonvested pension benefits, is not regarded as a fiduciary act. "[T]he sale of a business or portion of a business does not

impose a fiduciary duty on an employer to guarantee future, nonvested benefits."
*Dougherty v Chrysler Motors Corp.,* 840 F.2d 2, 3 (6th Cir. 1988). *See also Flanigan v General Electric Co.,* 242 F.3d 78, 88 (2nd Cir. 2001)(decision to spin-off a division and pension plan was a corporate business decision which did not trigger employer's fiduciary duties); *Blaw Knox Retirement Income Plan v White Consolidated Industries, Inc.,* 998 F.2d 1185, 1189 (3rd Cir. 1993)(affirming district court's finding that employer's sale of a division and transfer of pension plans was corporate business decision not subject to fiduciary review); *Phillips*, 799 F.2d at 1471 (Affirming district court ruling that "fiduciary provisions of ERISA are not implicated in the sale of a business merely because the terms of the sale will affect contingent and non-vested future retirement benefits."); *Sutton,* 724 F.2d at 411 (renegotiation or amendment of unfunded contingent early retirement benefits not subject to fiduciary review).

Therefore, Plaintiffs' claims in Count III fail as a matter of law. The ETA and VSETA, which are attached to and incorporated in Plaintiffs' Complaint, indisputably indicate that they were negotiated and executed to facilitate the spin-off and later re-acquisition of one of Ford's subsidiaries. And, the benefits which Plaintiffs claim were negatively impacted by Defendants' agreements were nonvested, contingent retirement benefits. Consequently, Defendants' negotiation and execution of the agreements were not fiduciary acts. This is true even if Defendants' sole motivation was, as Plaintiffs allege, to limit or eliminate Plaintiffs' future pension benefits which had not yet accrued. *See Sutton*, 724 F.2d 406 (an employer's alleged interest in avoiding future severance pay obligations are irrelevant since ERISA does not prohibit an employer from modifying ancillary, contingent benefits).

There is no merit to Plaintiffs' assertion that Defendants' motions must be denied because it is for the trier of fact to decide whether they were acting as fiduciaries when they performed the acts at issue. On a motion to dismiss, the burden is upon Plaintiffs to show that it has alleged facts which could support such a finding. *DeLorean,* 991 F.2d at 1240. However, they failed to carry that burden. The ETA and VSETA clearly constitute a modification and/or termination of Plaintiffs' benefit plans. There are no allegations in the Complaint which support a contrary interpretation of the agreements. Therefore, the agreements are not subject to fiduciary review. And, as stated, whether Defendants also harbored an additional selfish motivation for entering the ETA and VSETA is not relevant to whether such conduct is appropriately characterized as a business decision.

There is also no merit to Plaintiffs' assertion that Defendants' classification of them as "new hires" or "re-hires" under the VSETA after Ford's re-acquisition was an act of plan administration or management since Ford exercised its discretionary authority as the plan administrator and manager to decide how transferred employees would be treated under existing benefit plans. No such allegation is asserted in Plaintiffs' Complaint. And, in any event, the Sixth Circuit in *Sengpiel, supra,* rejected a similar argument.

In *Sengpiel*, B.F. Goodrich ("BFG") and Uniroyal Tire Company ("Uniroyal") spun off their respective tire divisions to a new company that they jointly formed and owned. BFG and Uniroyal agreed to transfer all of the assets of their respective tire operations to the new company. To accomplish the transfer, BFG split its retirement program into four plans categorized simply as "salaried tire," "wage tire," salaried non-tire," and "wage

24

non-tire."  Retirees associated with the tire division were assigned to one of the newly

formed tire pension plans.  A percentage of corporate staff retirees were also randomly

assigned based on their social security number to the tire pension plans, because BFG

could not accurately determine which corporate retirees performed more work in the tire

division, as opposed to other divisions.

The retiree plaintiffs transferred into one of the tire pension plans and

acknowledged that BFG's decision to spin-off its tire division and divide its benefit plan

into four smaller plans were not fiduciary acts.  But, plaintiffs argued that BFG's

"selection of the affected retirees and their subsequent assignment to the transferred

plans were discretionary acts of plan management or administration which are subject

to ERISA's fiduciary standards."  156 F.3d at 666.  The *Sengpiel* Court rejected this

argument.  The Court found that although BFG may have exercised some degree of

discretionary decision-making in choosing the method of dividing its benefit plan and

assigning employees to those plans, the discretionary authority used amounted only to

a ministerial implementation of its business decision to spin-off the tire division.

Therefore, the Court held that BFG's limited discretionary decision-making did not

constitute plan administration or management within the meaning of ERISA:

> [I]t is not the exercise of discretion alone that makes an employer's
> action subject to ERISA's fiduciary standards.  Rather, the statute
> and case law make clear that only discretionary acts of plan
> management or administration, or those acts designed to carry out
> the very purposes of the plan, are subject to ERISA's fiduciary
> duties.  BFG's ministerial application of a percentage classification to
> implement its business decision does not amount to an exercise of
> discretion of this character.  The district court correctly found that the
> actions undertaken by BFG to implement its business decision were
> simply not the kind of plan management or administration that trigger
> ERISA's fiduciary duties.

*Id.*

The same reasoning applies here. The VSETA provides that the post-Visteon retirement benefits for transferred employees will be provided under Ford's FRP. *See* VSETA at ¶3.01(a). The parties' agreement on this provision is simply an implementation of Ford's 2003 amendment to the GRP, which provides that employees hired or re-hired after January 1, 2004 are excluded from participating in the GRP and must, instead, participate in the FRP. To the extent the agreement in the VSETA is an exercise of discretionary decision-making authority, it is merely an implementation of Defendants' joint business decision that Ford would re-acquire certain Visteon plants and Ford's decision years earlier to modify the GRP.

Defendants motions to dismiss Count III is granted. It is not necessary for the Court to reach Ford's remaining arguments. And, allowing Plaintiffs to amend their Complaint to add an aiding and abetting claim against Visteon would be futile.

### D.      Count VI--Interference with ERISA Rights

Plaintiffs allege that Defendants violated ERISA Section 510, 29 U.S.C. §1140, when they classified Plaintiffs as "new hires/re-hires" pursuant to the VSETA. Plaintiffs allege that they were long term employees who were very close (several months to five years) to eligibility for the "30 and Out" early retirement supplement. Therefore, Plaintiffs assert that Defendants agreed to classify them as "new hires/re-hires" upon return to Ford to prevent Plaintiffs from taking advantage of a "break in service" rule, which would allow them to be reactivated as members of the GRP and to continue to accrue service credits necessary to reach "30 and Out" retirement status.

Section 510 provides in relevant part that:

26

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .

29 U.S.C. §1140. To state a *prima facie* case under Section 510, a plaintiff must show that there was: 1) prohibited (adverse) employer conduct 2) taken for the purpose of interfering 3) with the attainment of any right to which the employee may become entitled. *Marks v Newcourt Credit Group, Inc.,* 342 F.3d 444, 455 (6th Cir. 2003).

Ford asserts that Plaintiffs failed to allege the type of adverse employer conduct contemplated by Section 510. Ford argues that Section 510 protects an employee against adverse actions which affect the employment relationship giving rise to individual pension rights, not against modifications of the pension plan itself. However, Ford asserts that the conduct of which Plaintiffs complain--re-classification upon return to Ford--did not affect its employment relationship with Plaintiffs. Rather, Ford asserts that the classification was mandated by the 2003 amendments modifying the GRP.

Visteon argues that Plaintiffs' allegations are more appropriately directed at Ford, because Visteon was not an administrator of the GRP and, therefore, cannot give Plaintiffs the remedy they seek--an order rendering them eligible to reactivate and accrue service credits under the GRP. Therefore, Visteon says Plaintiffs failed to state a claim upon which relief can be granted against Visteon.

Plaintiffs assert that their allegation that Defendants classified them as "new hires/re-hires" when they were transferred from Visteon in order to deprive them of certain pension benefits states facts in support of each element of a Section 510 claim.

27

*See* Complaint at ¶¶66-67.  Plaintiffs also argue that the forced transfer from Visteon deprived them of tangible employment opportunities.  For example, Plaintiff Mark Ensley avers in an affidavit that he was deprived of an opportunity for promotion and salary increase within Visteon when he was forced to transfer to Ford.  Pl. Exh. 4.  However, this allegation is not made in Plaintiffs' Complaint.

And, inasmuch as Plaintiffs allege that Defendants acted in collusion, Plaintiffs further contend that their claim applies equally to Ford and Visteon, because the statute applies to "any person" who violates the act.  By its express language, Plaintiffs contend that Section 510 is not limited to the plan administrator.  If, however, Plaintiffs are required to seek alternate relief against Visteon, they request leave to amend their Complaint.

In anticipation of Ford's assertion that it was free to amend the GRP in 2003, Plaintiffs argue that this fact does not defeat their claim for several reasons: 1) there is no evidence that Defendant actually adopted the proposed November 2003 GRP amendment which excludes "new hires/re-hires" from participation in the GRP and, therefore, the amendment was ineffective;[10] 2) Ford did not timely amend the SPD to

_____

[10]Instead, Plaintiffs contend that the summary plan description ("SPD") dated May 2003 remained in effect and is controlling.  It provided that employees returning to Ford as regular salaried employees after a "break in service" would have credited service earned before the break restored.  Pl. Exh. 5.

In December 2005, Plaintiffs say that the SPD was again amended to provide that employees returning to the company after January 1, 2004 would have the credited service earned before the break restored and computed on benefit rates in effect at retirement.  Pl. Exh. 6.  With respect to this amendment, Plaintiffs argue that, "[t]o the extent that Ford provided a new SPD at the eleventh hour, that is, exactly at the time Plaintiffs were forced to transfer back to Ford in December 2005, such provision was unlawful and violated §510" and, therefore, "when Plaintiffs were rehired by Ford in

28

reflect adoption of the proposed amendment; 3) they were entitled, as participants in the GRP, to notice of the proposed 2003 amendment under §204(h); and 4) the proposed amendment was part of Defendants' scheme to interfere in violation of Section 510.

Lastly, Plaintiffs dispute Ford's assertion that it did not take any action which affected Plaintiffs' employment relationship. To the contrary, Plaintiffs argue that the forced transfers, re-classification (to avoid proper calculation of their benefits) and consequential loss of promotion opportunities went to the heart of their employment relationship with Defendants. And, Plaintiffs say that they are entitled to discovery on the issue of whether Defendants manipulated their employment status in order to circumvent or evade their ERISA benefits.

In reply, Ford argues that Plaintiffs' claim fails even if its transactions with Visteon are regarded as affecting its employment relationship with Plaintiffs because they have not shown that Ford took any action for the purpose of interfering with Plaintiffs' right to future benefits. Specifically, Ford argues that it is absurd for Plaintiffs to assert that it engaged in a convoluted series of transactions--the spin-off, 2003 amendment and re-acquisition--in order to reduce Plaintiffs' benefits when it could have simply terminated their participation in the GRP after the spin-off. And, Ford argues that: 1) Plaintiffs' claim is belied by Ford's pattern at each step of giving them greater benefits than they were entitled to; 2) there is no basis for finding that Ford anticipated the re-acquisition when it made the 2003 amendment; 3) the ETA clearly states that Ford intended for

December 2005 and January 2006, they were still eligible to take advantage of the break-in-service rule set forth in the May 2003 summary plan description." Pl. br. at p. 27 (footnote omitted). Plaintiffs contend that they should be granted leave to amend their Complaint to "further develop" this claim.

Plaintiffs to remain on track to receive their full early retirement supplement; 4) the 2003 amendment applied to all new hires and re-hires, not just Visteon transferees; and 5) the extended time between the 2003 amendment and the re-acquisition demonstrates that it was not directed at Plaintiffs.

Plaintiffs sufficiently alleged a violation of Section 510 against Ford and Visteon. They explicitly assert in Complaint paragraphs 64 through 68 that Defendants negotiated their return to Ford as "new hires/re-hires" to prevent them from taking advantage of an existing rule under the GRP (the "break in service" rule) which would have allowed Plaintiffs to continue accruing service credits towards the "30 and Out" early retirement supplement under the GRP. This allegation, which must be presumed true, covers each element of a *prima facie* claim. *See Marks*, 342 F.3d at 455.

Ford cites *Thomas v Smithkline Beecham Corp.*, 297 F.Supp. 2d 773 (E.D. Pa. 2003), in support of its assertion that an employer's classification of an employee is not the type of adverse employer conduct required to state a claim under Section 510. The *Thomas* plaintiffs began working with defendants through an assignment from a temporary agency. They were subsequently hired as regular full-time employees who were entitled to accrue retirement benefits. However, plaintiffs asserted that they were also entitled to accrue retirement benefits in their capacity as temporary employees. Defendants denied plaintiffs' request and advised that, prior to being hired as regular employees, they were "leased" employees who were not entitled to accrue benefits. Plaintiffs filed a class action suit alleging, *inter alia*, that defendants violated Section 510 by engaging in a pattern of misclassification to prevent the class from obtaining plan benefits.

Defendants requested summary judgment. The *Thomas* Court granted defendants' motion, asserting that plaintiffs failed to allege or present evidence of a Section 510 violation. However, the Court did not offer any analysis to explain its decision.

*Thomas* is not persuasive authority. The *Thomas* Court considered the plaintiffs' claim on summary judgment, rather than a motion to dismiss. Consequently, the *Thomas* Court's finding that plaintiffs failed to even allege a viable Section 510 claim is arguably dicta. And, even if the Court's finding were not dicta, the Court did not explain the basis for its decision and it is not apparent. Section 510 does not explicitly limit the type of conduct which may constitute adverse conduct under the statute. And, Ford does not cite any other authority indicating that claims that an employer reclassified or misclassified employees solely to deprive them of pension benefits to which they would otherwise be entitled are insufficient, as a matter of law, to state a claim under Section 510.

Ford also failed to establish an entitlement to dismissal based on the various reasons which it contends belie Plaintiffs' claim that its motive was to deprive them of retirement benefits. Even if true, none of the facts asserted by Ford forecloses Plaintiffs' claim at this stage of the case. Plaintiffs are not required to show that Ford's sole purpose was to interfere with their pension benefits, only that it was a motivating factor in the decision. *Humphreys v Bellaire Corp.,* 966 F.2d 1037, 1043 (6th Cir. 1992). Therefore, Plaintiffs' allegation that Ford (and Visteon) acted with the intent to interfere with their pension benefits is sufficient to state a claim.

 At oral argument, Plaintiffs asserted that they seek either injunctive relief or

monetary damages. Defendants contend, however, that ERISA's enforcement provision Section 502, 29 U.S.C. §1132, only provides for equitable relief, and that monetary damages are not regarded as equitable.[11]  It is not necessary for the Court to resolve this dispute at this time.  Defendants' motion to dismiss Count VI is denied.

## V.    CONCLUSION

Defendants' motions are **GRANTED** on Counts I through V and **DENIED** on Count VI.

**IT IS SO ORDERED**.


**S/Victoria A. Roberts**
**Victoria A. Roberts**
**United States District Judge**

**Dated:  July 10, 2007**

| |
|---|
| **The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on July 10, 2007.** <br><br> **s/Carol A. Pinegar** <br> **Deputy Clerk** |

---

[11]Section 502(a)(3) states:

A civil action may be brought--
* * *

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.